No. 96-236

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 138

STATE OF MONTANA,

Plaintiff and Respondent,

v.

KATHLEEN COCHRAN,

Defendant and Appellant.

APPEAL FROM: District Court of the Seventeenth Judicial District,

In and for the County of Blaine,

The Honorable John C. McKeon, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William F. Hooks, Appellate Defender Office, Helena, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Pamela P. Collins, Assistant Attorney General, Helena, Montana; Mark Harshman, Blaine County Attorney, Chinook, Montana

Submitted on Briefs: December 30, 1997

Decided: June 9, 1998

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 Kathleen Cochran (Cochran) appeals from the judgment entered by the Seventeenth Judicial District Court, Blaine County, on a jury verdict, convicting her of felony assault, and specifically from the District Court's denial of her motion to suppress evidence, her

motion for a directed verdict of acquittal, and her motion for a mistrial. We reverse.

¶2 Although Cochran raises several issues on appeal, we address only one, which is dispositive of this case: did the District Court abuse its discretion when it denied Cochran's motion for a directed verdict.

## BACKGROUND

¶3 Because the issue in this case involves the sufficiency of the evidence presented to support Cochran's conviction, we review in detail the following facts presented at trial. Police Officer Robert Painter was on patrol duty at approximately 4:30 a.m. on January 10, 1995, in Harlem, Montana, when he saw Cycil Jackson walking down the street. Painter approached him in his vehicle and asked him what he was doing at that hour. Jackson responded that he was on his way to a friend's house. Painter noticed that Jackson was holding his right arm, but assumed it was simply because Jackson was cold. Painter continued his patrol duties.

¶4 Fifteen to twenty minutes later, Painter saw Jackson again, approximately six city blocks from his first encounter. This time Painter got out of his car and approached Jackson. Jackson told him that his friend was not home, so he was walking to his brother's house. Painter offered him a ride, but Jackson declined. Painter noticed that Jackson was still holding his arm, but again assumed that Jackson was simply cold.

¶5 A little while later, Painter was dispatched to the home of Victoria Johnson. Painter was aware that Johnson resided with Lloyd Jackson, who was Cycil Jackson's brother. As Painter was driving to the home, he received another message that Johnson had withdrawn her request for police assistance. Painter went off duty at approximately 5:30 a.m.

¶6 According to Johnson, she was awakened during the early morning hours to the sound of someone knocking on her door. When she realized it was Jackson, she invited him in. Both Lloyd Jackson and she could see he was bleeding from his arm. Johnson asked Jackson if he had been stabbed, but he denied it, and instead stated that he had fallen on glass. Although his brother also repeatedly asked him what had happened, Jackson never gave him an explanation. Johnson telephoned the police, but canceled the call after Jackson told her that he did not want the police involved.

¶7 Johnson and Lloyd Jackson then took Jackson to the Indian Health Services Hospital at

Fort Belknap where he was treated by Dr. Ethel Moore. Dr. Moore testified that Jackson had sustained three wounds to his left arm: one across the shoulder joint, one in the mid-upper arm, and one just above the elbow. The two upper wounds were shallow and less than a half-inch in length, while the lower wound was deep and was an inch to an inch and a half in length. She characterized his wounds as stab wounds which could have been inflicted by a knife or a pair of sharp scissors. However, Jackson again denied having been stabbed and refused to tell her how he sustained the wounds.

¶8 In the meantime, Officer Charles Hunger, who is employed by the Fort Belknap BIA Police Department, was told that there was a stabbing victim in the emergency room and was dispatched to the hospital. However, Jackson similarly refused to tell Hunger what had happened, where he received his injuries, or who had been involved. Because Jackson was uncooperative, Hunger feared that there may be another victim somewhere. Hunger thus spoke with Jackson's brother, Lloyd, who informed him that he did not know how Jackson sustained the wound. Lloyd did tell him that Jackson lived with Kathleen Cochran, and gave him their address in Harlem, Montana. Because Harlem was outside of Hunger's jurisdiction, Painter, who by now was off work, was dispatched by the Harlem Police Department to assist Hunger.

¶9 Painter, Hunger, and a criminal investigator named Martin Wilke proceeded to Jackson's residence. As they approached the trailer house, they observed blood on the second stair leading to the house and blood in front of the windows in the snow. The three officers knocked on the door and on the windows on the north and east sides of the trailer, with no response. As they walked around the trailer, they observed no signs of a struggle or fight in the snow outside the residence. Painter saw blood droplets to the area north of the trailer with one set of footsteps by the blood spots. On the east side of the trailer, Painter and Hunger noticed that curtains in the east side window opened, then closed, but they did not see a person at that time.

¶10 While on the south side of the trailer, the officers heard voices and a banging noise coming from the inside of the trailer. It sounded to them as if a male and a female were fighting or wrestling. Painter testified that he heard a male state that he was going to get a gun, and a female trying to keep him from getting the gun. The officers feared that someone inside was about to be hurt. Painter thus radioed to the dispatch officer and informed him that there was an altercation proceeding in the trailer, and he did not have time to obtain a search warrant. He then forcibly entered, and Hunger and Wilke followed him inside.

¶11 Once inside, the officers discovered that the noise they had heard was actually coming from a television. They also found three individuals smeared with blood to varying degrees. The first individual was a man lying on the couch in the living room. According to Painter, he "was really hard to wake up." When he finally regained consciousness, he identified himself as Stan Lindemulder.

¶12 The officers located a second man in the bathroom, who was later identified as William Azure, also known as Billy Rose. Rose was sitting fully clothed in the bathtub with his legs draped over the edge as though he had been pushed in. He was intoxicated and was kicking and mumbling incoherently. He appeared to be trying to get out of the tub. Painter observed blood on his right coat sleeve.

¶13 Finally, in a bedroom where the officers had seen the curtains moving from the outside of the trailer, they located Kathleen Cochran. She was on her stomach on the floor, wearing a sweat top and spandex bicycle shorts inside out. They observed blood on her top, shorts, hands, feet, face and hair. Cochran appeared to be asleep, and the officers were unable to awaken her. They also noticed a set of keys clutched tightly in her fist. For their protection they took the keys in the event she did wake up or if she were only pretending to be passed out.

¶14 Painter returned to the Harlem Police Department, which was one block away, to obtain a camera and some sheets of paper to question the individuals and read them their rights, while Hunger and Wilke stayed with the individuals at the house. After taking the pictures, Painter was eventually able to awaken Cochran by standing her on her feet. He then placed Lindemulder, Rose and Cochran under arrest when they refused to cooperate or answer questions about what had happened.

¶15 Before leaving the trailer, the officers also observed blood on the kitchen floor, the table, and in the sink. In a wash basin in the kitchen sink they saw bloody water and a meaty tissue. They also observed a pair of scissors in the garbage can sitting on the top of the trash, that appeared to be functional and very clean.

¶16 After placing the individuals under arrest, Painter obtained a search warrant, and returned to the trailer. Among various items of evidence seized, Painter seized several knives, a broken plate, a pint-size empty bottle of Black Velvet whiskey that had blood on it, the pair of scissors in the garbage can, and a tin can that had been converted into a first aid kit, which was sitting on the table. The lid to the can was off and it contained gauze

pads and rolls. He also seized a pair of blood-stained women's jeans which were located under a shelf in a bedroom. Later that day, Painter also retraced the route he had seen Jackson walking on earlier. He observed blood droplets in various places along the route.

¶17 Subsequently, Cochran was charged by information with committing the felony offense of assault in violation of § 45-5-202(2)(a), MCA (1993), by stabbing Jackson with a knife or scissors. At trial, Painter demonstrated how the scissors he had seized were still functional. He also showed the jury a picture he had taken of Cochran's hand that depicted one large cut and several scratches. Painter demonstrated that when he held the scissors in his hand by grasping the blade of the closed scissors, the edge made contact with the lower part of his palm which approximated the area on Cochran's smaller hand where she was cut.

¶18 However, Jackson offered another explanation at trial as to how both Cochran and he sustained their wounds. Jackson specifically denied that Cochran stabbed him, and he specifically denied that he had ever told Johnson he injured himself by falling on glass. Instead, he blamed his injuries on two unknown assailants.

¶19 Jackson elaborated on the events that allegedly unfolded. He testified that he has lived with Cochran since the summer of 1993, and he continued to live with her throughout the trial. At approximately 10:00 p.m, Cochran and he went to a bar and played pool with Lindemulder and the bartender. Rose, who was with them at the trailer, stayed behind. Jackson drank two beers and two shots of whiskey, and at approximately 11:00 p.m., Cochran, Lindemulder and he returned to the trailer. Rose was still there and the four sat around drinking and talking. According to him, no one was arguing or fighting during this time period.

¶20 Lindemulder eventually passed out on the couch, and Rose passed out in a back room while Cochran and Jackson continued drinking and talking. After they had passed out, Jackson claims he exited the trailer to investigate a banging noise. He discovered two people whom he had never seen before wrestling by the stairs to the front door. Jackson approached the two men to try to break up the fight. He was not concerned for his own safety, because he had been an amateur boxer and believed he could defend himself. However, when he tried to push the two men apart, he felt some pain in his arm. When he grabbed his arm, it felt wet, and he realized he had been stabbed. Jackson did not see a knife, and he does not know which person actually stabbed him. He then walked back to the trailer, and he said he saw the two individuals run away in a northern direction.

¶21 Once inside the trailer, Jackson claims that he grabbed four steak knives and intended to assault the two men who had injured him. Before he could, however, Cochran grabbed his arm with both hands to stop him, and in the process she got blood on herself. She also scratched her own hand on the knifes when he attempted to jerk away from her. Eventually, Cochran dissuaded him from going after the two men, and she attempted to bandage his arm. When the bleeding did not stop, he walked to a friend's home for help and when the friend was not home, he walked to his brother's home. It was during his walk that he encountered Officer Painter twice.

¶22 Although the police station was one block from Cochran's home, Jackson said he did not want to walk there or tell the police what had happened because he feared they had a warrant out for his arrest in connection with other events. For that same reason, when he learned that Johnson had telephoned the police at his brother's home, he requested that she cancel the call. However, although the police now know where Jackson is, Jackson has still refused to talk with either the police or with anyone from the County Attorney's office about the incident.

¶23 Rose was also called as a witness at the trial. Rose had been a longtime friend of Cochran and her family since she was a child. Although he could not remember any particular dates, he did recall an incident when Jackson was injured at Cochran's residence, but he "wasn't paying too much attention" because he was "cooking vegetable soup." According to Rose, there was a party going on and people were coming and going, but again he was not paying attention to who else might have been there. When questioned whether he saw Jackson bleed, he again responded that he "didn't pay no attention." Rose recalled giving a statement to Officer Painter in January about the incident, but at the time of trial he claimed he did not recall any alleged statement that he saw Cochran grab Jackson and turn him around. He also claimed he did not recall any statement that he heard Jackson say to Cochran "Ouch, don't do that." No alleged statement of Rose was ever offered or admitted into evidence. Painter did not testify about Rose's alleged statement.

¶24 Lindemulder did not testify. He was not a resident of Harlem, and the prosecution was unsuccessful in its attempts to locate him.

¶25 At the close of the State's case, Cochran moved for a directed verdict. The court denied the motion, and the jury ultimately convicted Cochran of felony assault. The court sentenced her to a term of two years in the Montana State Prison on the charge of felony

assault, and an additional six years because the offense was committed with a dangerous weapon. Cochran appeals.

## DISCUSSION

¶26 Did the District Court abuse its discretion when it denied Cochran's motion for a directed verdict?

¶27 The State charged Cochran with felony assault in violation of § 45-5-202(2)(a), MCA, which provides:

> (2) A person commits the offense of felony assault if the person purposely or knowingly causes:

> (a) bodily injury to another with a weapon[.]

In this case, it was necessary for the State to prove that Cochran (1) purposely or knowingly, (2) caused bodily injury to Jackson, (3) with a weapon. At the close of the State's case, Cochran moved for a judgment of acquittal on the grounds that the State failed to prove that it was Cochran who stabbed Jackson.

¶28 Pursuant to § 46-16-403, MCA, a district court may direct a verdict of acquittal and dismiss a criminal action when the evidence is insufficient to support a verdict of guilty. Section 46-16-403, MCA, provides:

> When, at the close of the prosecution's evidence or at the close of all the evidence, the evidence is insufficient to support a finding or verdict of guilty, the court may, on its own motion or on the motion of the defendant, dismiss the action and discharge the defendant. However, prior to dismissal, the court may allow the case to be reopened for good cause shown.

We review a trial court's denial of a motion for a directed verdict to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Granby (1997), 283 Mont. 193, 199, 939 P.2d 1006, 1009 (citation omitted). A district court's decision lies within its sound discretion and will not be overturned absent

an abuse of that discretion. State v. Romannose (1997), 281 Mont. 84, 88, 931 P.2d 1304, 1307 (citation omitted).

¶29 In this case, we conclude that there is insufficient evidence to establish that it was, in fact, Cochran who assaulted Jackson. First, no direct evidence links Cochran to the crime. No witness testified that Cochran stabbed Jackson. Jackson himself never claimed to his family, the police, or his physician that he had been stabbed by Cochran, and at trial he expressly denied that it was she who assaulted him. The State argues that Jackson's account of how he sustained his wounds is not believable because both Officers Painter and Hunger testified that there was no sign of a scuffle with two other persons in the snow outside the trailer. Additionally, at no time did Jackson report the crime or take any steps to locate and prosecute these two unidentified assailants. However, proving that someone other than these two alleged unknown men stabbed Jackson does not constitute proof that Cochran stabbed him.

¶30 Second, the circumstantial evidence was equally insufficient. Officers Painter and Hunger found blood inside the trailer, particularly in the kitchen area, and to varying degrees on each of the three persons located in the home. They also observed signs of a scuffle inside the trailer, such as the broken plate. Although the evidence thus indicates that Jackson was probably stabbed inside the trailer, no evidence established that it was Cochran, as opposed to Rose or Lindemulder, who assaulted Jackson. The State argues that more blood was found on Cochran than on Rose or Lindemulder and that blood was found on a pair of jeans she had allegedly hidden. But the quantity of blood does not necessarily establish guilt. It is just as possible that blood got on Cochran when she attempted to give Jackson first aid, as he testified. The State presented no evidence as to when the blood got on the pants.

¶31 The State argues that other evidence suggests that Cochran is guilty. It points to the "suspicious disposal" of the clean, functional scissors. However, the State presented no evidence that Jackson sustained his wounds from the scissors, as opposed to a knife, and no evidence suggests that it was Cochran rather than Rose or Lindemulder who threw the scissors away. Additionally, the scissors were located on the top of the garbage in plain view; they were not "suspiciously" buried or hidden.

¶32 The State also points to cuts on Cochran's hands. Again, however, there is no evidence establishing when she got the cuts, and none of the kitchen implements were directly tied either to her cuts or to the stab wounds. Even if the cuts were obtained on the

evening of the incident, it is possible that she cut herself while trying to grab knives from Jackson's hands, as Jackson testified.

¶33 The State next argues that Cochran's behavior when the police arrived indicates a consciousness of guilt. The State insists that Cochran was only feigning sleep when the police arrived, and that she was the only person who could have opened and shut the curtains to the trailer moments before the police entered. However, the police did not actually see a person at the window when the curtains briefly opened and shut. Even assuming a person did open and shut the curtains, it could have been Rose, for example, who, although was heavily intoxicated when the police entered, was nevertheless awake. No evidence other than pure speculation indicates that Cochran was pretending to sleep. Officer Painter testified that he was unable to awaken Cochran until after he had retrieved his camera, taken pictures, and then forcibly stood her on her feet.

¶34 We conclude that the evidence presented was not sufficient to establish that it was Cochran who assaulted Jackson. Accordingly, we hold that the District Court abused its discretion when it failed to direct a verdict in favor of Cochran and dismiss the case. Cochran's conviction for felony assault is reversed and her sentence is vacated.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART